UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:16-CV-00077-TBR

GLORIA TASSY, *individually and on behalf of all similarly situated*,  PLAINTIFF

v.

LINDSAY ENTERTAINMENT
ENTERPRISES, INC.,  DEFENDANTS

**MEMORANDUM & OPINION**

This matter is before the Court upon Defendant's Motion to Stay Proceedings and Compel Arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 3. (R. 9). An evidentiary hearing was held on June 7, 2018 to resolve the threshold issue of whether Plaintiff, Gloria Tassy, entered into an arbitration agreement with the Defendant, Lindsay Entertainment Enterprises, Inc. (R. 59). The Parties have completed post-hearing briefing. (R. 65-68). Being otherwise sufficiently advised, for the reasons set forth below, the Defendant's Motion to Stay Proceedings and Compel Arbitration is **DENIED**.

BACKGROUND

Gloria Tassy is an exotic dancer. (R. 1). She worked at the Godfather gentlemen's club in Louisville, Kentucky from 2014 to 2016. (*Id.*). Lindsay Entertainment Enterprises operates the Godfather. (*Id.*). Lindsay Entertainment Enterprises classifies its dancers, including Tassy, as independent contractors. (*Id.*). As such, Lindsay Entertainment Enterprises never paid Tassy, or any of its other dancers a "direct wage." (*Id.*). Instead, Tassy and the other dancers were paid a certain percentage of the tips they earned from customers. (*Id.*).

1

Claiming that she was an employee entitled to a minimum wage under the Fair Labor Standards Act (FLSA), Tassy sued Lindsay Entertainment Enterprises, individually and on behalf of those similarly situated, in February of 2016. (*Id.*). Claiming that Tassy had executed an arbitration agreement, Lindsay Entertainment Enterprises moved to stay the proceedings and compel arbitration pursuant to § 3 of the Federal Arbitration Act. (R. 9). Tassy responded that she never entered into an arbitration agreement with Lindsay Entertainment Enterprises. (R. 17-1). Thus, the Court found there to be a factual dispute as to the arbitration agreement's existence and determined an evidentiary hearing to be necessary. (R. 24). Prior to holding the evidentiary hearing, the Court conditionally certified Tassy's FLSA collective action class on March 9, 2017. (R.33). Then, with leave to refile, the Court denied Lindsay Entertainment Enterprises' Motion to Stay Proceedings and Compel Arbitration. (R. 39).

On March 23, 2017 Lindsay Entertainment Enterprises appealed the Court's conditional class certification and the Court's ruling on its Motion to Stay Proceedings and Compel Arbitration. On February 22, 2018, the Sixth Circuit dismissed Lindsay Entertainment Enterprises' appeal from the Court's conditional class certification. (R. 46). However, the Sixth Circuit vacated this Court's ruling on Lindsay Entertainment Enterprises' Motion to Stay Proceedings and Compel Arbitration. (*Id.*). In remanding for further proceedings, the Sixth Circuit instructed the Court to "promptly determine whether the Parties agreed to arbitrate." (*Id.*). Accordingly, the Court set an evidentiary hearing for May 9, 2018. (R. 55). The sole issue to be decided by that evidentiary hearing was whether Gloria Tassy agreed to arbitrate. However, due to a scheduling conflict, the Court had no choice but to push the hearing back. (R. 58).

On June 7, 2018 the hearing finally occurred. (R. 59). At the hearing, the Court heard testimony from Tammy Sloss, Jason Crosby, and Scott Lindsay on behalf of the Defendant. On

behalf of the Plaintiff, the Court heard from Gloria Tassy, Melissa McGrew, and Karen Mead. At the hearing's close, the Court set a post-hearing briefing schedule for the Parties. (R. 61, Hr'g Tr., p. 123). The Court also instructed the parties to notify the Court when the post-hearing briefing had been completed and the matter was ripe for adjudication. (*Id.*). However, the parties failed to do so. In addition, CM-ECF has a program where anyone can see a pending motions report. It is supposed to show all pending motions in an active case before the Court. This was a briefing schedule, which did not appear on the pending motions lists. Frankly, this, combined with the Court's own oversight, has again caused this threshold issue to languish on the docket for longer than it should have. The Court accepts its share of the responsibility for the oversight, and albeit overdue, now sets about resolving the issue of whether Tassy agreed to arbitrate.

DISCUSSION

Lindsay Entertainment Enterprises' Motion to Stay Proceedings and Compel Arbitration turns upon one threshold issue: whether Gloria Tassy agreed to arbitrate.[1] If she did not, Lindsay Entertainment Enterprises' Motion must be denied. At least regarding this threshold issue, the parties' arguments are not complicated.[2] Tassy claims that she never signed an agreement containing an arbitration clause. (R. 10, pp. 2, 5-6; R. 17-1, p. 1; R. 21, p. 4). On the other hand, Lindsay Entertainment Enterprises claims that she did. (R. 9-1, p. 6; R. 13, pp. 2-4; R. 18, pp. 3-5). Lindsay Entertainment Enterprises claims that pursuant to its standard practice, prior to

---

[2]Gloria Tassy makes two other alternative arguments in the event that the Court finds that she indeed agreed to arbitrate. First, she asserts that the unexecuted Entertainment Lease (including the arbitration clause) is unenforceable in light of Kentucky's codification of the Statute of Frauds, Ky. Rev. Stat. § 371.010. *See* (R. 10 at 5–6). Second, she stresses that the arbitration provision in the Entertainment Lease is illegal since it prohibits an arbitrator from presiding over a collective action. *See* (R. 21 at 4–5) (discussing *Lewis v. Epic Sys. Corp.*, ––– F.3d –––, 2016 WL 3029464 (7th Cir. 2016)). Both points depend upon whether Tassy manifested her assent to the Entertainment Lease. As will be made clear below, the Court need not address these arguments.

3

working, all their dancers sign lease agreements that contain an arbitration clause. (R. 9-2, p. 2; R. 13-1, pp. 1-2). However, Lindsay Entertainment Enterprises is unable to produce such paperwork for Tassy because it was allegedly lost in a flood caused by a rusted-out water heater in the backroom where Tassy's paperwork was stored. (R. 61, Hr'g Tr., pp. 55, 68-70). Lindsay Entertainment Enterprises claims further that, even if Tassy never signed the lease agreement containing the arbitration clause, Tassy accepted the terms of that lease agreement by acting in accordance with the agreement's terms and continuing her employment. (R. 65).

Because arbitration agreements are, in essence, contracts, Kentucky law guides the Court's inquiry into the question of contract formation. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009); *Seawright v. Am. Gen. Fin. Servs., Inc.,* 507 F.3d 967, 972 (6th Cir. 2007). In Kentucky, as in all jurisdictions, a contract is only enforceable if both parties agree to be bound by it. *See, e.g., David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, 343 S.W.2d 389, 391 (Ky. 1976). According to Kentucky law, the initial burden of proving an agreement's existence rests with the party seeking to enforce arbitration. *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 857 (Ky. 2004). Furthermore, while there is a strong presumption in favor of enforcing valid arbitration clauses, that presumption is not applicable when determining whether an arbitration agreement exists in the first place. *See Clowdis v. Colo. Hi-Tec Moving & Storage, Inc.*, Civil Action No. 11-cv-00036-CMA-KMT, 2011 U.S. Dist. LEXIS 137380, at *10 (D. Colo. Nov. 3, 2011) (citing *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002)) ("However, when the parties dispute the existence of a valid arbitration agreement, there is no presumption in favor of arbitration."). Having considered the testimony and evidence given at the evidentiary hearing in its entirety, the Court finds that Lindsay Entertainment Enterprises failed to carry its burden.

A. Lindsay Entertainment Enterprises has Failed to Establish that Tassy Signed a Lease Agreement Containing an Arbitration Clause.

First, the Court is unconvinced that Tassy signed a lease agreement containing an arbitration clause. Lindsay Entertainment Enterprises points to two things to prove that she did—the testimony of their three witness at the evidentiary hearing and Lindsay Entertainment Enterprises' standard practices as described by those same witnesses. (R. 65). The Court will address each.

There were three witness who testified that Tassy signed a lease agreement containing an arbitration clause: Tammy Sloss, Jason Crosby, and Scott Lindsay. (*See* R. 61, Hr'g Tr.). The Court finds all three witness' testimony problematic. Starting with Sloss, the Court will address each witness's testimony and its corresponding problems.

Sloss is a Lindsay Entertainment Enterprises employee. (R. 61, Hr'g Tr., p. 47). She started working for the Godfather in 1998. (*Id.*). Since that time, she has left the Godfather at various times for numerous reasons, including to serve jail-time for drug-crimes. (R. 61, Hr'g Tr., p. 52). While employed at the Godfather, Sloss has done everything from dancing, to waitressing, to administrative work. (R. 61, Hr'g Tr., p. 47). Sloss's administrative duties include, hiring and firing dancers, dealing with questions the dancers have concerning paperwork and pay, and dealing with the credit card companies on the Godfather' behalf. (*Id.*).

According to Sloss, the new-hire process for dancers at the Godfather included the following steps in the following order: 1) two forms of identification were taken from the potential dancer, 2) the dancer would fill out paper work, and 3) the dancers would audition. (R. 61, Hr'g Tr., p. 48).

Sloss testified that a dancer would not be permitted to work without first signing the lease agreement. (*Id.*). Sloss also testified that that the lease agreement had not always contained one,

5

but from 2014-2016 the lease agreement included an arbitration clause. (R. 61, Hr'g Tr., pp. 48, 51). According to Sloss, Scott Lindsay, the Godfather's owner, and Phyllis, the bookkeeper, regularly changed the lease agreement. (R. 61, Hr'g Tr., pp. 56-58). When presented with it on the stand, Sloss seemed only generally familiar with the agreement. (R. 61, Hr'g Tr., p. 64). Sloss could not identify when the agreement handed to her on the stand was created, nor could she testify as to when it was used at the Godfather. (*Id.*). In fact, Sloss could not even identify if the agreement in front of her was the latest iteration. (*Id.*).

When Sloss was specifically questioned about Tassy's hiring, her memory was unclear in many regards—she couldn't remember what month it was, what season it was, who was bartending at the time, who else was there at the Godfather when Tassy was hired, or even who hired Tassy. (R. 61, Hr'g Tr., pp. 53-55). However, Sloss's memory was crystal-clear on a few crucial points. Sloss is sure that when Tassy came in for her initial meeting and audition, Tassy signed paperwork after bringing it to the back office where herself and Scott Lindsay were both present. (R. 61, Hr'g Tr., pp. 49-50). Sloss also appeared particularly sure that Tassy had "just put on a two-piece green outfit," along with a black pair of heels and red lipstick, presumably in preparation for her audition. (R. 61, Hr'g Tr., p. 50).

The Court finds Sloss's testimony problematic for several reasons. First, even if the Court finds it credible that Sloss saw Tassy sign a lease agreement, the Court is not convinced by Sloss's testimony that she can credibly claim to know which iteration of the lease agreement was signed by Tassy or whether the iteration signed in fact contained an arbitration clause. Sloss testified that she saw Tassy sign paperwork in the office, and that at that time it was standard practice to have included in that paperwork a lease agreement containing an arbitration clause. (R. 61, Hr'g Tr., pp. 48, 49-50). Importantly though, Sloss never testified to examining the

6

paperwork Tassy signed to make sure it contained a lease agreement iteration that included the arbitration clause. According to Sloss, the lease agreement was regularly changed, and it was clear from Sloss's testimony that she could not recognize which lease agreement iteration was in front of her by inspection, let alone by a glance. (R. 61, Hr'g Tr., pp. 56-58, 64). Therefore, even if Sloss indeed saw Tassy sign paperwork, the Court does not believe that without examining such paperwork and explicitly seeing the arbitration clause in the lease agreement, that Sloss can credibly testify as to what version of the lease agreement Tassy signed or whether that version indeed contained an arbitration clause.

Next, the Court finds it peculiar, at best, and incredible at worst, that Sloss vividly remembers Tassy signing paperwork, but can recall nothing else—the time of year, who was bartending, or who else was at the Godfather day. Sloss could not even remember who hired Tassy. Presumably that person would have had to show Tassy into the back office where Sloss and Lindsay were waiting. The Court finds it unlikely that Tassy just wandered into the back office with unsigned paperwork by herself.

Finally, the Court finds the largest problem with Sloss's testimony to be the same problem it has with Jason Crosby's testimony—the two contradict each other. Jason Crosby was a "jack-of all-trades" at the Godfather for roughly eight years, including from 2014-2016. (R. 61, Hr'g Tr., p. 67). He hired and fired dancers at the Godfather and was familiar with the hiring process. (*Id.*). Crosby's testimony contradicts Sloss's concerning the general hiring process, as well as specifically contradicting Sloss's testimony regarding Tassy's initial hiring. Unlike Sloss, who's testimony implies that an audition was a regular part of the hiring process, Crosby testified that only inexperienced dancers auditioned. (R. 61, Hr'g Tr., p. 73). Furthermore, and again contrary to Sloss's version of the general hiring process, Crosby claims that when an audition is

7

necessary, it occurs prior to the dancer completing paperwork—not after it, as Sloss testified. (R. 61, Hr'g Tr., p. 67). Crosby's testimony concerning Tassy's initial hiring is even more contradictory. He testified that upon Tassy's initial hiring, no one was working in the back office, he was the only person to go over paperwork with her, and that Tassy never auditioned because she had prior experience at other clubs. (R. 61, Hr'g Tr., pp. 72-77).

The inconsistency between Sloss's and Crosby's testimony concerning the general hiring process gives the Court considerable pause over whether the Godfather adheres to any form of standardized hiring processes. Furthermore, the starkly different accounts of Tassy's initial hiring are so disperate that if one is to be believed, the other is to be disbelieved. Neither account of Tassy's initial hiring is substantiated by any evidence beyond the two witnesses' disparate testimony, and the Court is unwilling to guess as to which account is true. As such, it must discount both.

According to Lindsay Entertainment Enterprises, the differences in testimony are explained by the fact that Sloss and Crosby are describing two separate occasions on which Tassy was hired. (R. 67). While the Court accepts that Tassy was likely hired multiple times, the Court finds that Sloss and Crosby were both describing Tassy's initial hiring. Sloss's testimony was in response to the question: "Do you recall when Gloria Tassy came for her audition and *initial* meeting?" (R. 61, Hr'g Tr., p. 49) (emphasis added). Similarly, Crosby's testimony was in response to the following exchange with Mr. Mazaheri:

> Q. Now, do you remember the first day that Gloria Tassy came to the Club?
> A. The first day?
> Q. Yes.
> A. I mean, she came in many times.
> Q. Do your recall the first day before she started actually dancing for the club?

> A. I believe so, but, I mean, I went over her contract twice with her. Both times were prior to convention season.
>
> Q. So the first time you went over the contract with her . . .
>
> . . .
>
> Q. Alright. So when Gloria Tassy came in saying "Hey, I'd like to dance," did you do the *initial* audition?

(R. 61, Hr'g Tr., p. 73) (emphasis added). The Court finds the most plausible interpretation of both Crosby's and Sloss's testimony to be that they were both describing the first time Tassy came into the Godfather looking to dance. In other words, both were describing Tassy's *initial* hiring—not separate and distinct instances, as suggested by Lindsay Entertainment Enterprises.

Having found Sloss and Crosby to discredit one another, the Court Turns to Lindsay Entertainment Enterprises' only other witness—Scott Lindsay. Scott Lindsay owns the Godfather. (R. 61, Hr'g Tr., p. 78). Lindsay testified that he does not remember the specific day Tassy was hired. (R. 61, Hr'g Tr., p. 80, 87, 90-91). Nor does Lindsay remember Tassy having any questions regarding the paperwork, contrary to Sloss's testimony that Tassy asked Lindsay a question about the lease agreement upon her initial meeting and audition. (R. 61, Hr'g Tr., p. 91). Instead, Lindsay falls back upon the Godfather's standard business practices, claiming that "if [Tassy] was in the building and leased space from me, she had the [lease agreement containing the arbitration clause] and signed it." (R. 61, Hr'g Tr., p. 81). The Court disagrees.

As far as the Court can tell, the Godfather has no precise hiring process, and its standard business practices are loosely held, if existing at all. From the testimony, as best the Court can tell, the hiring process went as follows: two forms, or sometimes only one form, of identification was taken, an audition may or may not have taken place, and at some point, paperwork was filled out. The paperwork allegedly included a lease agreement containing an arbitration clause, but that lease agreement had been continuously and regularly changed, and none of the three

9

witnesses seemed to be too familiar with it. Multiple people had autonomous authority to hire dancers without consulting other members of staff, and instead of being scanned into a computer filling system—despite having a scanner and a computer with which to do so—paperwork was boxed up and, apparently in accordance with no organizational system whatsoever, thrown into a back room. Sloss, who allegedly handled administrative matters, including record keeping, could not even answer for which former dancers the Godfather still had arbitration agreements for and which they had lost in the alleged flood. Instead, she only knew that "there was boxes of paperwork back there" that got destroyed. (R. 61, Hr'g Tr., p. 56). The Court finds it unlikely that any of the witness knew with certainty that all the dancers received and signed the same paperwork from 2014-2016. Furthermore, Lindsay and Sloss both testified that the lease agreement constantly changed. (R. 61, Hr'g Tr., pp.56-58, 61, 79, 80, 88, 95). None of the witnesses were able to demonstrate great familiarity with the agreement or the arbitration clause contained therein. In fact, Sloss could not even identify whether the lease agreement in front of her was the latest iteration, and Lindsay completely misunderstood the arbitration clause to demand the plaintiff pay arbitration costs. (R. 61, Hr'g Tr., pp. 64, 92). Therefore, based on the ever-changing nature of the lease agreement, the witness' lack of familiarity with the lease agreement, the witness' lack of familiarity with the arbitration clause allegedly contained therein, the Godfather's imprecise hiring practices, the Godfather's imprecise general business practices, and the failure to produce any agreement signed by Tassy, the Court finds all Lindsay Entertainment Enterprises' witnesses to be uncredible when they claim to know with certainty that all the dancers hired from 2014-2016 signed a lease agreement iteration containing an arbitration clause. Instead, the Court finds it plausible, and indeed probable, that some dancers

from 2014-2016, including Tassy, received some older iteration of the lease agreement without the arbitration clause.

The Court notes the inconsistencies in Tassy's testimony and those testifying on her behalf, as pointed out by Lindsay Enterprise Entertainment. However, the burden is the Defendant's—not the Plaintiff's. *See Cox*, 132 S.W.3d at 857. The Defendants were required to make a prima facie case for the existence of an arbitration agreement. For the reasons detailed above, they have not. The inconsistencies in Tassy's account, and in the accounts of those who testified on her behalf, do nothing to prove that she entered an arbitration agreement. Nor do those inconsistencies cause the Court to believe that Tassy's version of events is any less likely than the Defendant's own inconsistent and unlikely account. Ultimately, after weighing all the evidence, the Court finds that Lindsay Entertainment Enterprises has failed to make out a prima facie case for the existence of an arbitration agreement between itself and Tassy.

B. Tassy's Actions Do Not Indicate That She Agreed to Arbitrate.

The Court is equally unconvinced that Tassy agreed to arbitrate by continuing to work at the Godfather knowing of the arbitration provision and acting in accordance with the terms of the lease agreement. Lindsay Entertainment Enterprises is correct in that "Kentucky courts will [ ] enforce unsigned arbitration agreements where the parties have indicated acceptance of the contract through their actions." *Sweeney v. Theobald*, 128 S.W.3d 498, 501 (Ky. Ct. App. 2004). "Under Kentucky law, a party can be bound to a contract, even in the absence of a signature, when her actions indicate acceptance of the contract's terms." *Braxton v. O'Charley's Rest. Props., LLC*, 1 F. Supp. 3d 722, 727 (W.D. Ky. 2014) (*citing Polly v. Affiliated Computer Servs., Inc.*, 2011 U.S. Dist. LEXIS 2614, 2011 WL 93715, at *2 (E.D. Ky. Jan. 11, 2011); *Sweeney*,

128 S.W.3d at 501). However, Lindsay Entertainment Enterprises' application of this concept to the circumstances at hand is misguided.

Here, Lindsay Entertainment Enterprises argues that by complying with the Godfather's rules and policies, as set forth in the lease agreement, Tassy's actions indicate acceptance of the terms of the lease agreement, including the arbitration clause. (R. 65). The Court disagrees. Tassy's actions indicate only that she was aware of the Godfather's policies and rules, which she admits. (R. 61, Hr'g Tr., p. 12). Tassy's actions, however, provide no indication that she was ever made aware that one of those policies was an agreement to arbitrate. By Lindsay Entertainment Enterprises' logic, any employee who followed the policies and rules set out by an employer, in contract or otherwise, would be automatically bound to arbitrate, should the employer later fabricate a claim that an arbitration clause was included in the original contract or otherwise made known to the employee. This a step too far and would require the Court to compel arbitration any time a policy abiding employee disputed the existence of an arbitration clause but was otherwise made aware of the employer's policies and rules. The Court is unwilling to do so. Instead, it finds, under these circumstances, that Tassy's actions indicate only that she was aware of the Godfather's policies and day-to-day rules—not that she agreed to arbitrate.

Finally, the Court takes due note of Tassy's Notice of Supplemental Authority. The Court is aware of the Supreme Court of Kentucky's recent holding in *Northern Kentucky Area Dev. Dist. v. Snyder*, No. 2017-SC-000277-DG. Tassy was correct—at the time—to bring such authority to the Court's attention. However, since *Northern Kentucky Area Dev. Dist. v. Snyder*, Kentucky State Senate Bill 7, which amends KRS 336.700 and will apply both prospectively and

retroactively, was signed into law on March 25, 2019. It effectively nullifies the Supreme Court's holding in *Northern Kentucky Area Dev. Dist. v. Snyder*.

CONCLUSION

For the reasons stated above, the Court finds that Plaintiff Gloria Tassy did not agree to arbitrate, and Lindsay Entertainment Enterprises' Motion to Stay Proceedings and Compel Arbitration pursuant to § 3 of the Federal Arbitration Act, (R. 9), is **HEREBY DENIED**.

A telephonic conference between the Court and the Parties is set for April 8, 2019 10:00 AM Central Time, 11:00 Eastern Time. The Court will place the call.

**IT IS SO ORDERED.**

cc: Counsel of Record